**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **Crim. No.  2:25-CR-401** |
| | : | |
| **RUBEN MARTINS** | : | |
| | : | |

**DEFENSE SENTENCING MEMORANDUM FOR RUBEN MARTINS**

Ruben Martins, through his counsel Lawrence J. Bozzelli, respectfully submits the following Defense Sentencing Memorandum in the above cited case and is requesting a downward variance from the calculated sentencing Guidelines.

In summary, Ruben Martins would ask that your Honor impose a sentence of 24 - 36 months in addition to a 3-year period of Supervised Release.    The Guideline range has been calculated by U.S. Probation to be 87 – 108 months based upon a 27/ III range.

Mr. Martins stands before this Court with no criminal history whatsoever, a documented and difficult childhood marked by parental neglect and instability, a demonstrated record of legitimate employment and self-improvement, and a clear acceptance of responsibility for his conduct. None of these excuses the offense, but it is precisely the kind of history that 18 U.S.C. § 3553(a) asks this Court to consider in fashioning a sentence that is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. We respectfully request that the Court impose a sentence at the low end of the

1

applicable guideline range, or a downward variance, in light of the factors set forth above.

## I.    INTRODUCTION

On September 9, 2025, the U.S. Attorney's Office filed a 4 count Bill of Information against Martins in which he was charged with several charges including *Conspiracy to Commit Wire Fraud*, 18 U.S.C. §1349 and *Wire Fraud*, 18 U.S.C. 1343.

On March 30, 2026, the defendant appeared before your Honor and pled guilty to counts 1 through 4 of the Bill of Information, pursuant to a written plea agreement.

## II.    DEFENDANT'S BACKGROUND AND LIFE CIRCUMSTANCES

### Personal Life

After getting to know Ruben Martins and reading the PSR, certain things become clear.  In short, this was a young man who grew up in a working class neighborhood and was easily seduced by acquiring fast money with a few strokes of the keyboard.

### Martin's childhood was defined by absence, not structure

Mr. Martins's parents separated when he was five, and after that he grew up without the stability most children expect. His father was, in Mr. Martins's words, mostly absent from his life, moving between Portugal and Scotland and, according to Mr. Martins, dealing with his own criminal issues instead of being present as a parent. His mother struggled with substance use throughout his childhood. She made sure he stayed in school, but he says she could not provide steady supervision, structure, or even basic care at home. PSR ¶55-56. Mr. Martins remembered having to learn to do his own laundry as a young child just to have

2

clean clothes for school. Child protective services got involved with the family more than once because of the conditions at home. PSR¶57.

This was not a home where resources were available, but ignored. It was a home without a parent who could take care of him. The small amount of stability Mr. Martins had came from his maternal grandmother, who tried her best but could not replace the role of two missing parents. He has talked about experiencing physical discipline at home, which he was taught to see as normal. This shows not a problem with him, but a home where no adult could show a different way.

### Martins is a bright man, who never had a creative outlet

Despite this environment, Mr. Martins was advanced a grade in primary school. He has a demonstrated aptitude for and interest in technology that no one in his life had the means to cultivate. He taught himself computing on secondhand hardware, by his account, a hand-me-down PlayStation and an old Toshiba laptop were the only tools he had. PSR ¶64-65.  He later enrolled in a vocational college to study welding and, more recently, applied to St. Andrews University, a decision that reflects genuine ambition and an intent to build a different life. He withdrew from his vocational program not from lack of effort but for lack of money to pay tuition. By age 16 he was already working in a fish factory, and by 17 in a meat factory, where he was eventually entrusted with real responsibility as a transport manager overseeing budgets and logistics for the company's trucking operations. This is not the profile of a young man unwilling to work. It is the profile of a young man who worked hard within a set of options that were never adequate to his ability.

3

**How the criminal actions arose**

This is the context in which the online fraud scheme should be seen. Mr. Martins did not set out to become a career criminal. Instead, he was gradually drawn in through online gaming and social media, where he had built a reputation as a skilled, semi-professional player. Someone he met in those communities, who had the means to fly him to Paris and introduce him to wealthy people living a life he had never experienced, recruited him into the scheme. For a young man who has said simply, "I don't have a lot of money, my family don't have a lot of money," the offer did not look like a crime. It looked like a way out of the hardship described in this letter.

Mr. Martins has not tried to downplay what he did or blame others. He has said clearly that he knew his actions were wrong, that he pleaded guilty because he accepted responsibility, and that he stole from hardworking families who did not deserve it. This is a real acknowledgment of responsibility that the Court should recognize. It is not an attempt to justify his actions, but a sign that he understands the harm he caused and has chosen to face it honestly.

### III.    POST-*BOOKER* SENTENCING IN THE THIRD CIRCUIT

A district court commits procedural error when it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence. *United States v. Genao*, 869 F.3d 136, 140

4

(2d Cir. 2017).

After the Supreme Court's decision in **United States v. Booker**, 543 U.S. 220, just as before it, a sentencing court must correctly calculate a defendant's guideline range and then consider whether there is any basis set forth in the Guidelines Manual to "depart" from the range. However, the practical effect of **Booker** was to add a third step in the sentencing process— namely, the court's decision whether, after considering all of the factors in 18 U.S.C. § 3553(a), a sentence outside of the applicable guideline range should be imposed as a "variance."   See USSG §1B1.1, comment.  This **Booker** "three-step process" requires "respectful consideration" of the Guidelines Manual in all three steps. See **Kimbrough v. United States**, 552 U.S. 85, 101 (2007).   The three steps are: (1) to initially calculate the sentencing range; (2) to consider policy statements or commentary in the Guidelines Manual about departures from the guideline range; and (3) to consider all of the § 3553(a) factors (which include the guidelines, commentary, and any relevant policy statements in the Guidelines Manual) in deciding what sentence to impose, whether within the applicable range, or whether as a departure or as a variance (or as both). See **Gall v. United States**, 552 U.S. 38, 50 n.6 (2007) ("The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." ).

Since the Guidelines became advisory, however, sentencing procedures have evolved to the point where courts routinely bypass the second step and address the defendant's mitigating or aggravating circumstances by reference to the § 3553(a) factors rather than under the policy-driven departures under the Guidelines.  The 2025 Guidelines remove the

second step to more accurately reflect the actual sentencing practices of federal courts. As such, all of the departure provisions and related policy statements have been deleted from the body of the Guidelines Manual and instead consolidated in Appendix B for historical reference, with the exception of U.S.S.G. § 5K1.1, which allows sentence reductions based on a defendant's assistance to the investigation, and U.S.S.G. § 5K3.1 (now 3F1.1), which provide for reductions in cases involving early dispositions ("fast track" pleas)–both of these departures remain in effect.

IV.     **THE PURPOSE OF SENTENCING**

The Courts have long understood that sentencing serves the purposes of retribution, deterrence, incapacitation, and rehabilitation. Deterrence, incapacitation, and rehabilitation are prospective and societal—each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community? ***United States v. Cole***, 622 F.Supp.2d 632 (N.D. Ohio 2008)

Federal sentencing law generally tracks these purposes. Section 3553 tells the Federal Courts to choose a sentence that reflects the seriousness of the offense (retribution), promotes respect for the law (retribution, general deterrence), provides just punishment for the offense (retribution), affords adequate deterrence to criminal conduct (general deterrence), protects the public from further crimes of the Defendant (specific deterrence, incapacitation), and provides the Defendant with needed training, care, and treatment

6

(rehabilitation). 18 U.S.C. § 3553(a)(2).

## RETRIBUTION

One can say that "retribution" imposes punishment to reflect respect for the dignity of the victim. In other word, society stands with victims and exacts punishment in rough approximation to the detriment caused by the defendant.  Retribution is about "just deserts" and the sentence should be proportionate to the defendant's moral culpability.

In Martins' case, retribution is warranted because of the money taken from individual accounts.  As mentioned, this is Martins first ever arrest and the first time that he spent in jail.  Martins has spent 2 years in jail and has suffered through horrific conditions.

According to the U.S. Sentencing Commission, the average sentence for those defendants convicted of theft and fraud offenses was 23 months.[1] The average loss amount in these cases is around $200,000.  Martins plead guilty to defrauding D.W. of $56,924.

## REHABILITATION

The "goal" of "rehabilitation" is the attempt to turn one person's path away from crime and towards being a productive, law-abiding citizen.  § 3553(a)(2)(D) directs the court to consider the need for the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." The purpose of rehabilitation is forward-looking and need-based.  It asks what this

---

[1] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY23.pdf#:~:text=*%20Theft%2C%20Property%20Destruction%2C%20and%20Fraud.%20*,Under%20the%20Guidelines.%20Manual%20(55.9%25)%20Variance%20(44.1%25)

defendant needs to be rehabilitated, not what a generic offender convicted of a generic offense requires. Where a defendant has already demonstrated, through years of conduct, that he doesn't need the structure of incarceration to desist from prior criminal patterns, a long sentence isn't advancing rehabilitation, rather it's simply incapacitation or retribution wearing rehabilitation's label.

As it relates to Martins, a two-year federal prison sentence for a first-time, non-violent offender often serves as a structured catalyst for personal rehabilitation and long-term compliance with the law. Martins also lead a law-abiding life prior to his offense in this case.

INCAPACITATION

Incapacitation under § 3553(a)(2)(C) asks one forward-looking question: how much future danger does *this defendant* pose to the public, such that removing him from society for a longer period reduces that danger? Because it is a prediction, it should be grounded in the best available evidence about this individual's risk of future violence, not in the worst-case profile the statute was designed to reach.

Cesare Beccaria Bonesana is often cited as the father of modern criminal law in *On Crimes and Punishments*, wherein he argued that the <u>effectiveness</u> of punishment is found <u>in its certainty and promptness, not its severity</u>. His work is a concise treatise that would become the crown jewel of the Italian Enlightenment and a classic text of modern penality. Bonesana's key argument was that excessively harsh sentences do not deter crime more

8

effectively than moderate ones; instead, they harden the individual and make them more callous toward society.

For Martins, he has already served 2 years and any further period of incarceration would not punish or change his behavior. If the 2 years spent in the FDC hasn't convinced Martins to never commit another similar crime, then nothing would.

DETERRENCE

Deterrence has both a specific and a general function. Specific deterrence dissuades the particular defendant from engaging in criminal conduct. In contrast, general deterrence discourages others from engaging in similar criminal conduct.

Another problem with justifying punishment as a means to deter others, besides its ineffectiveness, is that it is immoral to punish one person merely to promote deterrence of others.  "Judicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, *The Science of Right* 195  (1790).

A sentence of 24 months of incarceration, combined with everything else this conviction already imposes, is a substantial and serious consequence, not a light one and there is no evidentiary basis to conclude that doubling or tripling that term meaningfully increases the likelihood that this particular defendant refrains from future firearm possession.

## IV.   THE APPLICATION OF DEPARTURES AND VARIANCES

The Third Circuit specifically endorses the terminology of "departure" to refer to a sentence outside of the range that was contemplated by the guidelines system, and "variance" to refer to a sentence outside of the range that was imposed under the court's discretion pursuant to §3553(a). It asks that district courts and counsel employ this terminology as well. *United States v. Jackson*, 467 F.3d 834, n.2 (3d Cir. 2006).

## V.   <u>DOWNWARD DEPARTURE CONSIDERATIONS</u>

The defense could not find any applicable downward departures that apply in this case apart from those afforded to the defendant's early guilty plea as outlined in USSG §3E1.1.

## VI.   <u>IMPORTANT FACTORS TO CONSIDER PRIOR TO SENTENCING PURSUANT TO § 3553(a) / VARIANCES FROM THE SENTENCING GUIDELINES</u>

### (1) <u>MARTINS WAS VERY YOUNG WHEN HE COMMITTED THESE CRIMES</u>

When Martins stands before you at sentencing, he is only 24 years old. During the core period of the charged conduct (2022–2024), he was between 20 and 22 years old. Studies show that his brain is still developing, and the lure of quick money from a faceless victim added to his poor choices.

Raised in modest circumstances in Portugal and working manual labor jobs (fish/meat

10

factories) from the age of 15, Mr. Martins was vulnerable to exploitation. Older, highly sophisticated international actors lured him into high-stakes fraud after offering lavish trips (e.g., Paris) and cash bribes.

**(2) <u>TREATING SIMILARLY SITUATED DEFENDANTS EQUALLY</u>**

 The defense has found several cases in which defendants in Federal court received far lesser sentences what the PSR is recommending for Martins.  To be very candid, defense counsel has reviewed any information that was available on these cases (PSRs, notes of testimony, sentencing memorandum, etc) and almost all of the defendants had agreed upon Offense Gravity scores that were far less than Martins. Each defendant **could have been charged with the same upward enhancements**, but for some unknown reason, they never were added as part of their pleas.  These cases include:

- **Anthony Faulk** - The defendant recently was sentenced to 48 months in prison in a related case in the Northern District of Georgia alleging a conspiracy to launder the proceeds of a SIM swapping scheme. See Judgment in a Criminal Case, United States v. Faulk, 20-CR-014-3 RWS (N.D. Ga. June 21, 2023).  His offense level was a 22 with an increase of +16 for loss and +2 for Offense involving 10 or more victims, U.S.S.G. § 2B1.1(b)(2)(A)(i)

- **Joseph "Plugwalk Joe" O'Connor** – "O'Connor defrauded, threatened, abused, and extorted several individual victims, including a 16-year-old girl against whom O'Connor perpetrated vicious swatting attacks, prompting an emergency police response.  From about March 2019 to May 2019, O'Connor, working together with

11

other coconspirators, perpetrated a SIM swap scheme, which involved the theft of a large amount of cryptocurrency, then valued at approximately $794,000 (and currently valued at more than $1.4 million), belonging to customers of a victim company ("Company-1"), a technology company headquartered in Manhattan. O'Connor's crimes caused substantial economic and non-economic harm to Company-1 and its employees" – AUSA sentencing memorandum

- o The parties agree that O'Connor's Guidelines range is 70 to 87 months' imprisonment, based on a total offense level of 27 and a Criminal History Category of I. (PSR ¶ 17).

- **Joseph Persad** – "For nearly eighteen months, defendant and his co-conspirators hacked into the victims' email accounts, hijacked their cell phone numbers, and gained unauthorized access to their online cryptocurrency accounts. As a result of this scheme, often referred to as "SIM swapping," defendant and his co-conspirators stole close to $1 million worth of cryptocurrency from dozens of victims, including approximately $30,000 from a victim in Arizona. Defendant's conduct caused substantial financial hardship to these victims, several of whom lost their life's savings. Defendant and his co-conspirators then divided these stolen funds amongst themselves, with defendant keeping around $475,000. The Presentence Investigation Report (PSR, doc. 21), calculates an offense level of 21 and a criminal history category of I, which corresponds to a Guidelines range of 37-46 months in custody. The government agrees with the Guidelines calculation." – AUSA sentencing memorandum

12

- **Nicholas Truglia** – was sentenced in 18 months in prison for his participation in a SIM swap theft and over $20 million was stolen from the victim. 1:19-CR-921.   In this case, the Judge appears to have given great weight to the defendant's ability to repay $20 million to the victim, but also that other who committed the crime were never charged.

The take away from these cases is that it would not be inappropriate to give Martins a sentence around 24 – 36 months based upon the conduct of these similarly situated defendants.

**(3)  HISTORY OF EMPLOYMENT**

As indicated in the PSR, Martins began working at the very young age of 15 years old in very demanding jobs.  He rose through the ranks to work in a management position.  This shows that he is not someone who is dependent on a life of crime to exist.

**(4)  IMMIGRATIONS CONSEQUENCES**

The Court should also consider the effect of the sentence in this case on Mr. Martins, irrespective of any imprisonment term. Since he is a citizen of Portugal and has no legal status in the United States, he will be deported once any sentence that this Court passes has been carried out. He has never resided in this country. As a result, any sentence of incarceration will be one that is entirely separate from any family, followed by his permanent deportation to a country where the only home he has ever known (the house on High Street

13

in Turriff that his family have occupied for more than 20 years) is now unoccupied. Whatever sentence the Court hands down will in all practical terms be served and then some.

Alos, as a non-U.S. citizen subject to an ICE detainer, Mr. Martins is ineligible for minimum-security placement, halfway houses, or early release programming (such as FSA time credits), making his custodial serving conditions significantly more punitive than for domestic offenders.

### (5) THE DEFENDANT HAS NO PRIOR CONVICTIONS, BUT DOES NOT BENEFIT FROM THE 4C1.1 DEPARTURE BECAUSE OF THE CRIME

Under 4C1.1, a defendant with no criminal history points would ordinarily be entitled to a 2-point downward departure.  This would lower his range from 30/I to 28/I and that would result in a 19 to 24 month reduction in his sentencing range.  However, Martins is not entitled to this credit because it is not allowed to be applied to anyone that had an matter that caused "substantial hardship" to a victim.

### (6) THE IMPERSONAL CRIME

The defendant carried out this crime using only electronic methods, without ever having any direct or personal contact with the victim. At no point did the defendant meet, speak with, or communicate with the victim before, during, or after the unauthorized transfer of funds. There was no confrontation, coercion, threat, or misuse of a personal relationship or trust. The theft was strictly transactional and impersonal, involving manipulation of financial systems rather than the victim as an individual. This absence of personal contact is a

14

significant mitigating factor under 18 U.S.C. § 3553(a). It distinguishes this case from offenses that involve direct targeting, psychological manipulation, or face-to-face deception, and indicates a lower degree of moral blame and a reduced risk of harm compared to crimes where the offender directly exploits or manipulates another person.

### (7) MARTINS HAS A LARGE COMMUNITY OF SUPPORT

Ruben Martins has enjoyed strong support from his family which is evident from the several letters of support attached to this defense sentencing memorandum.  Your Honor can see all the letters in their entirety, but here is a small sampling of the sentiments expressed in the letters:

- "**Ruben started to work when he was 15 at the local fish factory, every one liked him there. When he left , the manager asked him to stay but he didn't. After that he went to work at a warehouse of a meat factory.  A few months later he was promoted into the office. Again every one liked  Ruben. He was polite, well mannered and liked to help others.**" – Angela Gabriel

- "**From the few times I have spoken with him, he has expressed how much he regrets his past decisions and how he wants to turn his life around. He has told us about wanting to go to university to study cyber security.  Filipe has always done his best to help our grandparents in Portugal. He would visit every couple of months and help them get to appointments and help them financially.**" – Daniel Gabriel

15

**(8)** <u>**MARTINS IS NOT ELIGIBLE TO TAKE ADVANTAGE OF FIRST STEP ACT CREDITS BECAUSE OF HIS IMMIGRATION STATUS**</u>

The defense believes that while non-citizens without a formal Order of Removal can accrue FSA credits, but an ICE detainer will typically block transfer to prerelease community custody (home confinement or halfway houses) under BOP policy.  Further, the defense believes that for non-citizens with a Order of Removal, the statute acts as an absolute bar, thus the earned credits are forfeited/rendered unusable for early release, and the individual must serve their sentence (less standard Good Conduct Time) before being transferred to ICE custody for deportation.

As per 18 U.S.C. §3632(d)(4)(E)(i), "A prisoner is ineligible to apply time credits under subparagraph (C) if the prisoner is the subject of a final order of removal under any provision of the immigration laws …"   In early 2025, the BOP issued two internal memoranda that dramatically changed how the First Step Act is applied to individuals with immigration detainers. The first, dated January 30, 2025, instructed prison officials to cancel any pending prerelease placements for non-citizens with active detainers. The memo allowed up to 365 days of credits to be used for early supervised release but barred the use of additional credits for home confinement or halfway house placement. Again, this was a carve out based on an internal directive, most likely to conserve limited halfway house capacity for use by US citizens. A follow-up memorandum issued on April 8, 2025 reaffirmed this position and required the redesignation of all non-citizens with detainers back to secure institutions, except where a court order or settlement required otherwise.

16

In short, an illegal alien serving a federal sentence can participate in First Step Act programming and earn FSA time credits. However, such a prisoner cannot apply those credits toward prerelease custody or early transfer to supervised release if a final order of removal has been entered.  The statute mandates that immigration removal proceedings be initiated as early as practicable during incarceration for deportable aliens, which means that in practice, many undocumented noncitizens in federal custody will ultimately be subject to a final removal order and thus unable to benefit from the early-release mechanism that FSA time credits provide.

## VII.     CONCLUSION

Taken together, the Court should impose a sentence of 24 – 36 months for all of the reasons outlined above.

Respectfully submitted,

LAWRENCE J. BOZZELLI
Attorney for Ruben Martins

Date: August 10, 2026

Angela Gabriel

DOB 18/09/1975

17 Red well Court

Whitehills

AB45 2RF


Dear honourable Judge


My name is Angela, I am Ruben's aunt, I've known him since he was born.

I live in Scotland and Ruben always lived near me. Ruben and my son Daniel are very close (like brothers).

Ruben started to work when he was 15 at the local fish factory, every one liked him there. When he left , the manager asked him to stay but he didn't. After that he went to work at a warehouse of a meat factory.  A few months later he was promoted into the office. Again every one liked  Ruben. He was polite, well mannered and liked to help others.

A few years ago, I went into the hospital for 3 weeks, I have severe heart failure, the left ventricle was working less than 15%. Ruben was away at the time but he got the next available flight and came straight to the hospital to see me. At the time he said he could take me to a specialist if I wasn't well cared for at the hospital.

I know he did a mistake, but I believe that he has learnt his lesson.

When he comes back home, to the UK, he will come to live with us. We will help him in everything we possibly can, accommodation, food, help him to find a job...

We love him very much and we would love it if you could get him back home as soon as possible .


Sincerely

Angela Gabriel

My name is Hamza, and I have known Filipe Martins for about 8 years. We met when I was 13 and he was 16, and in all that time he has been like a brother to me.

From the day I met him, Filipe looked out for me. Whenever I was struggling, he was there. If I ever needed something, he would find a way to make it happen — even when he couldn't really afford it, he would still try. That's just who he is.

We were in Boracay, Philippines. One night, we came across a group of homeless kids on the street. I'll be honest, I was hesitant, but Filipe couldn't bring himself to walk past them. He went to a shop and bought them food, then arranged a hotel room for them — a nicer one than the room we were staying in. The next day, he took them to the mall and bought them clothes and toys. I was unsure about all of it at first, but that's simply who Filipe is. He loves helping people, and he genuinely can't stand to see someone in need.

That same selflessness is also what can lead a person into difficult situations, because caring that deeply about everyone around you isn't always easy. But I don't believe anyone should be judged by their mistakes alone. They should be judged by their character, and the Filipe I know is one of the most loyal, generous, and good-hearted people in my life.

I respectfully ask that you take these qualities into account when considering his situation, because they reflect who he truly is.

Sincerely,
Hamza

Dear Sir or Madam,

My name is Carlos Alberto Gabriel. I am 77 years old and reside in Lisbon, Portugal. I am the paternal grandfather of Rúben Filipe Gabriel Martins.

Rúben has always been a good boy. He used to come to Portugal very frequently and was always very concerned about my health and that of my wife, helping us with everything we needed. He has always been very present in our lives. He is a respectful and well-mannered young man with a very kind heart. He has always shown great consideration and respect towards older people.

I am aware of the situation he is currently facing and, as his grandfather, it is extremely painful for me to see him going through such a difficult time. I believe that he is genuinely regretful and that he is fully aware of the mistakes he has made.

Despite the distance between us, we have never left him alone. We have always supported him and encouraged him to turn his life around. Rúben is still very young and has his whole life ahead of him, with plenty of time to change his ways.

We are a family who love him very much, and we will continue to stand by his side and do everything we can to support him.

I am writing this letter with great sadness, but also with great hope. I respectfully appeal to the authorities to give him an opportunity. If he is given a chance, I am certain that my grandson will choose a better path in life.

Best regards,

Carlos Alberto Gabriel

Dear Sir or Madam,

My name is Maria Manuela and I am the maternal grandmother of Rúben Filipe. I am Portuguese and live in Lisbon, Portugal. However, for approximately 20 years, I divided my life between Portugal and long stays in Scotland, where Rúben lived with his siblings and his mother.

I was present at the birth of all my grandchildren, including Rúben Filipe. As a devoted grandmother, I shared with my daughter Raquel (Ruben's mother) a significant part of my grandchildren's childhood and adolescence. It was very important to me to be closely involved in my grandchildren's lives, to give them my love, and to provide them with the care and affection that all children need and deserve from their grandparents.

As a result, I know my grandson Rúben Filipe very well. Rúben is kind, very well-mannered, a loyal friend, and very devoted to his family. In particular, he has always been very protective of and devoted to his mother. They share a very beautiful and special bond.

Before this situation arose, it was usual for Rúben to visit us in Portugal. He has always remained present in our lives. Now that my husband and I are older and in poorer health, our grandson has always been very attentive to our needs, showing us genuine care and affection and helping us whenever we needed it.

I am aware of the situation he is currently facing and of the mistakes he has made. As his grandmother, I feel profound sadness. It is extremely painful to see my grandson going through all of this. However, I firmly believe that Rúben is truly regretful and that he is fully aware of the mistakes he has made.

Despite the distance that separates us, our family has never left him alone. We have always been there to support him and give him the strength not to give up, so that he can find the right direction in his life. My grandson is still very young, and I know that he is capable of changing his future. We are a family who love him very much, and we will continue to stand by his side and help him with all his needs.

I am writing this letter from the heart, with the hope that Rúben Filipe will be given an opportunity to rebuild his life and reintegrate into society.

Best regards,

Maria Manuela

Dear Sir or Madam,

My name is João Pedro Gabriel Bartolomeu, 28 years old, residing in Lisbon, Portugal, hereby declare that I am the brother of Ruben Filipe Gabriel Martins.

I have known Ruben my entire life and can confidently say that he is a humble, good-natured person with strong family values. Throughout his life, he has consistently shown care and dedication toward our family, particularly through his ongoing support of our grandparents and our mother. Our relationship as brothers has always been close and built on mutual respect and support.

One example of his character can be seen in the way he has always cared for our grandmother, who suffers from health issues and occasionally requires medical examinations and medications that can be expensive for our family. Whenever Ruben was with us, he would often contribute financially to help cover these costs. He also assisted around the house whenever our grandmother was not feeling well and needed additional support.

Ruben has always been aware of our family's financial situation. I live with my grandparents, Manuela and Carlos, and our financial resources are limited. In addition, I have Type 1 diabetes, which requires ongoing medical care and monthly expenses for glucose monitoring sensors and other essential supplies. Understanding these challenges, Ruben consistently looked for ways to help wherever he could, whether through financial assistance or by taking on responsibilities that eased the burden on our household.

Despite his current circumstances, I continue to believe in his character and in his ability to rebuild his life and move forward in a positive direction. He is a young man of 24 years old with significant potential to learn from his mistakes and build a better future.

Throughout his period of incarceration, our family has never stopped supporting him, both emotionally and financially, despite our own financial challenges and the distance between us, as we reside in Lisbon, Portugal. In addition to the support provided by our household, other members of our family in Scotland, including his mother and uncles, have also remained actively involved in his life, offering both emotional encouragement and financial assistance whenever possible.

This continued support reflects the strong family bonds that surround Ruben and our collective belief in his ability to rebuild his life. Our commitment remains unwavering, and we are fully prepared to assist him with his reintegration by providing stability, guidance, emotional support, and practical assistance in every area necessary to help him become a productive member of society. We love Ruben and want to see him recover and successfully reintegrate into society. We are committed to remaining present in his life, just as we always have been, not only during this difficult period but throughout his entire journey.

I declare that this letter reflects my sincere opinion, and I am available to provide any additional information or clarification if required.

Sincerely,

João Bartolomeu

Dear Judge,

My name is Daniel Gabriel. I am 24 years old and I am a self-employed window cleaner in the north east of Scotland. Ruben Filipe Gabriel Martins is my cousin. I am aware that he is facing sentencing.

Although his first name is Ruben, we have always called him Filipe. Similarly, my full name is Carlos Daniel Santos Gabriel but my parents and the rest of my family have always called me Daniel.

I have known Filipe my entire life. He is 7 months older than I am, and we were raised almost as brothers. Filipe was raised by his working single mother, and I was raised by my parents that both worked too. We lived in the same town called Turriff. We were always together growing up. If my parents were working, I would stay with my auntie and my cousin Filipe. If my auntie was working, Filipe would stay with us.

We went to the same primary school for a few years until my parents moved to a neighbouring town. Later on, we went to the same secondary school called Banff Academy. Filipe was always in the year above me but we would see each other almost everyday at school and most weekends.

Almost 7 years ago we started working at the same place. It was a meat factory for Morrisons, a big supermarket chain in the UK. I was a butcher while he started working in the warehouse and later was promoted to the warehouse office.

Filipe was always a hard worker. He would very rarely call in sick or come to work late. He got on well with all of his colleagues and managers.

I have known Filipe like a brother, and he has never had any trouble with the police or any other authorities before this time.

Filipe has always done his best to help our grandparents in Portugal. He would visit every couple of months and help them get to appointments and help them financially. When my sister-in-law passed away in Portugal. My wife and I had to buy next day flights to make it to the funeral. Funerals in Portugal are usually held less than 72 hours after the persons death. Filipe offered to help pay for our flights. When my mother was in hospital Filipe came back early from his holiday in the Philippines to see her. She was later diagnosed with severe heart failure and he offered to help pay for the surgery if it had to be done privately. The NHS has very long waiting lists. These are only some examples of times Filipes has helped us all. He never hesitates to help even at his own expense.

 I have only been able to speak with Filipe a handful of time since he was arrested almost 2 years ago. Filipe usually phones my mother when he can. My mother, Angela, no longer works as she is disabled so she is always at home and available to answer the phone call. I have been fortunate enough to be able to speak to him whilst I have been at my parent's house and Filipe has called.

From the few times I have spoken with him, he has expressed how much he regrets his past decisions and how he wants to turn his life around. He has told us about wanting to go to university to study cyber security.

Filipe is more than welcome to live with my wife and I until he gets back on his feet. Filipe left his previous employment on good terms and could very likely get a position there again. We live just next to the bus route that connects all the main towns to the main city Aberdeen which is about 50 miles from where I live and has more employment opportunities.

All of his family, both here in the UK and in Portugal miss Filipe very much, and not being able to visit has been very difficult. We are all very grateful for the possibility of being able to support Filipe during his trial over zoom/video call.


Thank you very much your Honour, for taking the time to read this letter.


Yours sincerely,

Daniel Gabriel